IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CALEB FLITCROFT,

              Plaintiff,

v.

GREG LEWIS Warden,

              Defendant.

NO. C10-4901TEH

ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

**BACKGROUND**

Caleb Flitcroft, ("Petitioner" or "Flitcroft") lived with his girlfriend, Brittany Syfert, sharing a home in Ukiah, California. Flitcroft, Brittany, Brittany's mother, father, and step-mother, and various friends and relatives were all in attendance at a birthday party held for Brittany at the house on the evening of November 12, 2005. The attendees included a co-worker of Brittany's, Gloria Gutierrez, Gloria's boyfriend Jesse, Gloria's cousin Rudy, and a friend named Skylar.

The facts, as described by the California Court of Appeal, were as follows. Brittany was talking to Jesse, Rudy and Skylar at the party, upsetting Flitcroft, who became jealous and approached Brittany, who did not stop talking to the group. When Gloria, Jesse, Rudy and Skylar left the house, they said goodbye to Brittany and departed through the front yard. As they went down the driveway, Flitcroft followed them. Some witnesses said that Flitcroft swung first at Rudy. Skylar then punched Flitcroft, as did Jesse, who punched Flitcroft numerous times in the head. Flitcroft let go of Rudy and fell to the ground. Ultimately, the fight was stopped by Brittany's father John, who pinned Jesse on the ground.

According to Mercedes, Brittany's step-mother, when she went to help Flitcroft clean up his bloody nose, she called out to Brittany to let Brittany know that Flitcroft had been

hurt. She then recalls Flitcroft saying that he had had it with Brittany, and was through with her. Flitcroft then went into the house.

Flitcroft then retrieved a nine-millimeter semi-automatic handgun from his bedroom, and came back out of the house. Standing about 10 feet away from Brittany and Rudy, who were standing about a foot apart on the driveway, Flitcroft fired in their direction. Rudy believed Flitcroft was aiming at him, but he was merely grazed by a single bullet, while Brittany was hit five times in her back, chest and arm. Flitcroft was tackled by Brittany's mother and was assaulted by other guests. Ultimately, he freed himself, ran to his truck, and fled the scene. Brittany was taken to the hospital, where she died. Flitcroft, when apprehended, admitted to firing on Rudy, but maintained that he never intended to shoot at Brittany, and had not seen her there, as the night was dark. He had a blood alcohol level of 0.12 about three hours after the shooting.

At trial, the prosecution argued both a separate-intent theory of the crime and a transferred-intent theory of the crime. The transferred-intent theory required the jury to find that Flitcroft shot at Rudy with malice, the intent required for a murder conviction, and that this intent was transferred from his intended victim to Brittany, his actual victim. This theory would require that Flitcroft be convicted of the attempted murder of Rudy and the murder of Brittany. Alternatively, the prosecutor proposed a separate-intent theory, meaning that Flitcroft, at the time he shot, separately intended to kill both Rudy and Brittany.

The jury was given the standard California instructions on first and second degree murder, voluntary manslaughter, express and implied malice, provocation and self-defense, attempted murder, and manslaughter. They were also properly instructed on transferred intent. However, the jury, during their deliberations, sent a question to the court:

> We would like clarification on whether or not defendant could be guilty of attempted voluntary manslaughter in Count 2 [regarding Rudy] and murder in second degree in Count 1 [regarding Brittany].

The prosecutor's position was that the court should answer the question "Yes" and not offer further instruction. The defense argued that in order to reach a verdict of attempted voluntary manslaughter with regards to Rudy, the jury would have to have concluded that

2

Flitcroft lacked the requisite intent for murder (or that the intent was negated by provocation, or imperfect self-defense), and therefore, under a transferred intent theory, lacked the intent for a finding of second degree murder with regards to Brittany. The court replied that the jury could find that the defendant had the requisite intent and still render a verdict of voluntary manslaughter. The defense responded that this was incorrect, because a finding of attempted voluntary manslaughter requires a finding of a mental state without the requisite intent (malice) required for murder. The court concluded otherwise, finding that in a verdict of manslaughter "there's still an intent to kill." All parties now agree (and agreed on direct appeal) that this conclusion is incorrect, as California Penal Code section 192 dictates that manslaughter, by definition, excludes malice. The court decided to instruct the jury as follows:

> Depending on what theory of the case the jury relies on, the result suggested by your question in this case is possible.

The defense objected and asked the court to simply refer the jury back to California's standard instructions, CALCRIM 522 (provocation and degrees of murder), 570 (voluntary manslaughter), and 571 (imperfect self defense). This objection was overruled, and the court ultimately instructed the jury, immediately before the jury retired for the evening, that both verdicts were possible. The next morning, the jury came back with verdicts of attempted voluntary manslaughter as to Rudy and second degree murder as to Brittany.

On appeal, the California Court of Appeal affirmed the conviction, acknowledging that a transferred intent theory would not allow the verdicts rendered by the jury, but finding that there was substantial evidence to support a finding of these verdicts under a separate intent theory, and that the appellant could not meet the burden of proving that the jury's finding was based on transferred, rather than separate intent. The judgment was affirmed in June of 2009, and the California Supreme Court denied review in August of that year. Petitioner filed his writ of habeas corpus in October of 2010, and the case was transferred to this court in September of 2011.

3

**LEGAL STANDARD**

Relief by writ of habeas corpus may be granted to a person who is incarcerated pursuant to a state court judgment if such custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375 fn. 7, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In this case, the Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution, and the challenged conviction arises out of the Mendocino County Superior Court, which is located within the jurisdiction of this Court. Therefore this Court has jurisdiction. 28 U.S.C. § 2241(d); 2254(a).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. *Lindh v. Murphy*, 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir.1997). The instant petition, having been filed after the enactment of the AEDPA, is governed by its provisions. Under those provisions, federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

AEDPA establishes a "highly deferential standard for evaluating state-court rulings" requiring "that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002), quoting *Lindh*, 521 U.S. at 333 n. 7 (internal quotation marks omitted). The petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e) (1). A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from a Supreme Court case, yet reaches a different result." *Brown v.*

4

*Payton*, 544 U.S. 133, 141, 125 S.Ct. 1432, 161 L.Ed.2d 334 (2005) citing *Williams*, 529 U.S. at 405–06. The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.' " *Musladin v. Lamarque*, 555 F.3d 830, 839 (2009). However, "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.... The statue recognizes ... that even a general standard may be applied in an unreasonable manner" *Panetti v. Quarterman*, 551 U.S. 930, 953, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) (citations and quotation marks omitted).

For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. *Lockyer v. Andrade*, 538 U.S. 63, 70–71, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75–76, quoting *Williams*, 529 U.S. at 409–10; *Woodford v. Visciotti*, 537 U.S. 19, 24–25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002).

"An unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, ––– U.S. ––––, ––––, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011). If "fairminded jurists could disagree on the correctness of the state court's decision" then the decision may be incorrect, but may not rise to the level of unreasonableness. *Id.* at 786 (citing *Yarborough v. Alvarado*, 541 U.S. 653, 664 (2004), internal quotation marks omitted). "The more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." *Id.; Renico v. Lett*, ––– U.S. ––––, ––––, 130 S.Ct. 1855, 1864, 176 L.Ed.2d 678 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 556 U.S. 111, ––––, 129 S.Ct. 1411, 1419, 173 L.Ed.2d 251 (2009), quoted by *Richter*, 131 S.Ct. at 786.

5

**DISCUSSION**

In order for relief to be granted under AEDPA, the ruling of California Court of Appeal must have been contrary to, or an unreasonable application of, clearly established Supreme Court law, or else the decision must have been based on an unreasonable determination of the facts. Here, the decision of the Court of Appeal was that the Superior Court judge's response to the jury's question was not erroneous, and that there was no evidence the jury relied on a transferred intent theory in coming to their verdict. The court found that there had been substantial evidence presented in support of a separate intent theory, and the jury may have come to their verdict on the basis of separate intent.

Where there has been no error, there is a presumption that the jury correctly followed their instructions. *People v. Guiton*, 4 Cal.4th 1116, 1127 (1993). Here, the Court of Appeal found no error, and therefore presumed that the jury relied on a separate intent theory of the case in coming to their verdict, as a transferred intent theory would have been a legally invalid basis for this verdict.

This Court must determine whether the state appeals court's opinion rises to the level AEDPA requires, a determination which rests upon two primary inquiries. First, does the Court of Appeal's decision that the trial court's response to the jury was not erroneous constitute a decision which is contrary to, or an unreasonable application of clearly established Supreme Court law? Second, was the Court of Appeal's decision that there was substantial evidence supporting the verdict contrary to, or an unreasonable application of clearly established Supreme Court law?

Regarding the first question, the law states that a trial court has an affirmative duty to clarify an issue where the jury has indicated confusion. *McDowell v. Calderon*, 130 F.3d 833, 839 (9th Cir.1997) (en banc). As a rule, instructional errors also require a showing of prejudice–specifically, whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *see also Fry v. Pliler*, 551 U.S. 112, 121–22, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (holding that the *Brecht* standard applies whether or not the state court

recognized the error and reviewed it for harmlessness). In charging the jury, the trial judge has wide discretion, and this discretion "carries over to a trial judge's response to a question from the jury." *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir.2003) (citing *Allen v. United States*, 186 F.2d 439, 444 (9th Cir.1951) ("The giving of additional instructions has always been held to be within the discretion of the trial court.")). Nevertheless, the trial court has a "duty to respond to the jury's request with sufficient specificity to clarify the jury's problem" *McDowell v. Calderon*, 130 F.3d 833, 839 (9th Cir.1997) (en banc). Furthermore, a jury is presumed to understand a judge's answer to a question. *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000); *but see United States v. Frega*, 179 F.3d 793, 808–11 (9th Cir.1999) (trial judge's confusing response to jury's questions raised possibility that verdict was based on conduct legally inadequate to support conviction). In short, when considering whether a trial court's response to a jury's question was erroneous, the reviewing court considers whether the judge fulfilled his responsibility to eliminate the jury's confusion. *United States v. Frega*, 179 F.3d 793, 805 (9th Cir.1999), *cert. denied*, 528 U.S. 1191, 146 L.Ed.2d 105 *and cert. denied sub nom*; *see also United States v. Hayes*, 794 F.2d 1348, 1352 (9th Cir.1986).

According to Petitioner, the indication of confusion in this case was the juxtaposition of the two verdicts. Petitioner argues that, by asking whether the two verdicts were possible together, the jury implied that it believed there was some relationship between the two verdicts. Petitioner asks the Court to construe this juxtaposition as an indication of the jury's use of a transferred intent theory. Petitioner's argument rests on the assumption that because there is no need to ask whether any two verdicts are possible *together* when relying on a separate intent theory (as neither verdict has an impact on the other), the question of the jury in this case requires the conclusion that the jury could only have asked this question if they were using a transferred intent theory. The answer given by the trial court, then–the simple "yes"–would have been incorrect, as the two verdicts posed in the jury question are *not* possible under a transferred intent theory. Here, the question before the Court is not whether the state trial court judge correctly understood this, or gave the best possible answer

7

to the jury's question, but only whether the Court of Appeal's determination that the judge correctly responded to the jury's question, and met that affirmative duty to clarify the issue for the jury, was unreasonable, or contrary to clearly established Supreme Court law.

The Supreme Court has clearly stated that it is reversible error for a trial judge to give an answer to a jury's question that is misleading, unresponsive, or legally incorrect. *Bollenbach*, 326 U.S. at 612-13; *Frega*, 179 F.3d at 810. In this case, the jury had been properly instructed on both separate and transferred intent, and there had been evidence presented in support of both separate and transferred intent theories. Moreover, the trial court judge's response to the jury question clearly pointed out the differing impact of the two theories on the answer to the question–the judge responded, "*Depending on what theory of the case the jury relies on*, the result suggested by your question in this case is possible." (Emphasis added). The discussion outside the presence of the jury aside, the actual answer given to the jury–that the two results were, in fact, possible, depending on which theory of the case the jury chose to use–was, in fact, legally correct. The answer itself, therefore, was not misleading, unresponsive, or legally incorrect.

Moreover, even if an instruction is determined to be erroneous and in violation of the Constitution, the error must be shown to have had a substantial and injurious influence in determining the jury's verdict–otherwise, federal habeas relief is not warranted. *See Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *see also Fry v. Pliler*, 551 U.S. 112, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (when reviewing a claim governed by § 2254, the Court is required to perform analysis of the effect of constitutional error under *Brecht,* without regard to any harmless-error standard employed by the state court). A challenged jury instruction cannot be merely "undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). Instructional error must "so infect[] the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). Here, the answer is correct, but even if it were construed in the most unflattering light, it

8

1  could not be determined to have had the substantial injurious effect required when any
2  presumption of injury rests on the assumption that the jury must have overlooked, or
3  misunderstood the portion of the judge's response which invoked the differing standards.
4        Turning to the second question, the Court of Appeal found that there was substantial evidence of express malice towards both Brittany and Rudy, and, even if there were not, "overwhelming evidence of *implied* malice" (emphasis in original). On page 10 of the opinion, the Court of Appeal set forth the standard for implied malice as follows:

> [I]mplied malice requires proof that the defendant (1) intentionally committed an act, (2) the natural consequences of which were dangerous to human life, (3) knowing at the time that his act was dangerous to human life, and (4) deliberately acting with conscious disregard for human life. *(People v. Taylor* (2004) 32 Cal.4th 863, 867, 11 Cal.Rptr.3d 510, 86 P.3d 881; CALCRIM No. 520.) Implied malice does not require hatred or ill will toward the victim. In fact, it may exist if the perpetrator is unaware of the identity of a victim or even her existence. ( *Taylor*, at p. 868, 11 Cal.Rptr.3d 510, 86 P.3d 881; People v. Scott (1996) 14 Cal.4th 544, 555, 59 Cal.Rptr.2d 178, 927 P.2d 288 (conc. opn. of Mosk, J.); *People v. Albright* (1985) 173 Cal.App.3d 883, 887, 219 Cal.Rptr. 334.) As our Supreme Court has explained: "When a defendant commits an act, the natural consequences of which are dangerous to human life, with a conscious disregard for life in general, he acts with implied malice towards those he ends up killing. There is no requirement the defendant specifically know of the existence of each victim." ( *Taylor*, at p. 868, 11 Cal.Rptr.3d 510, 86 P.3d 881.)

Implied malice was clearly supported by the evidence–Flitcroft fired numerous times into a gathering of people, aiming either at a man standing next to the ultimate victim, or, according to the testimony of Mercedes (described above), perhaps even aiming at the victim herself. The jury was properly instructed on both express and implied malice. Even if one accepts entirely the idea that Flitcroft did not intend to kill Brittany–and it is not clear that the jury did, in fact, make this finding– there was nevertheless substantial evidence supporting separate intents: express malice towards Rudy, which was then negated by provocation and/or imperfect self defense, and implied malice towards Brittany, due to the conscious disregard of the risk to her life inherent in shooting at Rudy when he stood in the midst of a gathered group, with multiple other people standing around him. Moreover, the statements to which Mercedes testified supported the further theory that there was, in fact, express malice sufficient to support a verdict of murder as to Brittany under a separate intent theory. The

9

1 Court of Appeal's finding that there was substantial evidence to support the verdicts in this
2 case was not contrary to, nor an unreasonable application of clearly established Supreme
3 Court law.

*Request For Evidentiary Hearing*

"[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record." *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir.1998). In the instant case, as the issues can be resolved by reference to the state court record, an therefore evidentiary hearing is not required.

**CONCLUSION**

Because the decision of the California Court of Appeal was not contrary to, or an unreasonable application of clearly established Supreme Court law, and did not rest upon an unreasonable determination of the facts in this case, the petition for writ of habeas corpus is DENIED.

**IT IS SO ORDERED.**

Dated: 7/23/12

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

10